Robert V. Prongay (SBN 270796)
Charles H. Linehan (SBN 307439)
Pavithra Rajesh (SBN 323055)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

*Counsel for Lead Plaintiffs*
*James Alpha Funds*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALEX SWARTZENDRUBER, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>COLONY CAPITAL, INC., THOMAS J. BARRACK, JR., MARK M. HEDSTROM, and DARREN J. TANGEN,<br><br>Defendants. | Case No. 2:20-cv-04673-RGK-AS<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION AND OVERVIEW ........ 1

II. JURISDICTION AND VENUE ........ 3

III. PARTIES ........ 4

IV. STATEMENT OF FACTS ........ 7

A. Background Of Colony Capital's Business ........ 7

B. Colony Capital Announces Sale Of Industrial Portfolio As Part Of Strategic Transition To Digital Infrastructure Company ........ 9

C. Colony Capital Announces Consummation Of Agreement To Sell Industrial Portfolio And Affiliated Operating Platform ........ 14

D. The Truth Begins To Emerge: First Partial Corrective Disclosure ........ 15

E. Defendants' Further Misleading Statements On The Q3 2019 Earnings Call ........ 18

F. Defendants' Misleading Statements In Connection With The Release Of Colony Capital's Q4 2019 And FY 2019 Results ........ 19

G. The Truth Fully Emerges: Second Partial Corrective Disclosure ........ 22

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 22

A. Defendants' False And Misleading Statements To The Public On August 9, 2019 ........ 22

B. Defendants' False And Misleading Statements To The Public On September 30, 2019 ........ 27

C. Defendants' False And Misleading Statements To The Public On November 8, 2019 ........ 30

D. Defendants' False And Misleading Statements To The Public On February 28, 2020 .......... 31

E. Defendants' False And Misleading Statements To The Public On March 2, 2020 .......... 33

VI. LOSS CAUSATION .......... 34

VII. ADDITIONAL SCIENTER ALLEGATIONS .......... 37

A. Colony Capital's Historic Goodwill Impairment Practices Highlight The Intentional And/Or Deliberately Reckless Nature Of Defendants' Failure To Disclose The Anticipated Goodwill Impairments In Q2 2019 .......... 38

VIII. CLASS ACTION ALLEGATIONS .......... 42

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE .......... 45

X. COUNTS .......... 46

XI. PRAYER FOR RELIEF .......... 50

XII. JURY TRIAL DEMANDED .......... 50

Lead Plaintiffs James Alpha Global Real Estate Investments Portfolio and James Alpha Multi Strategy Alternative Income Portfolio (together, the "James Alpha Funds" or "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Colony Capital, Inc. ("Colony Capital" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases issued by and disseminated by Colony Capital; and (c) review of other publicly available information concerning Colony Capital.

## I. <u>NATURE OF THE ACTION AND OVERVIEW</u>

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Colony Capital securities between August 9, 2019 and May 7, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Colony Capital is a leading global investment management firm. As of June 30, 2019, Colony Capital had assets under management of approximately $55 billion. The Company manages capital on behalf of its stockholders, as well as institutional and retail investors in private funds, and traded and non-traded real estate investment trusts.

3. On August 9, 2019, Colony Capital announced that it would sell its multibillion-dollar industrial portfolio and, potentially, its related management platform.

4. On September 30, 2019, Colony Capital announced that Blackstone (NYSE: BX) would acquire Colony Industrial, the industrial real estate assets and affiliated industrial operating platform of the Company, for $5.9 billion.

5. On November 7, 2019, Colony Credit Real Estate, Inc. (NYSE: CLNC) ("Colony Credit")—a publicly traded REIT managed by a subsidiary of Colony Capital—announced that "third party valuation experts assisted the [c]ompany in a robust strategic reassessment of [its] entire asset base," that, "[d]uring this process [the company] identified and separated a Legacy, Non-Strategic Portfolio and made meaningful changes to the original business plans," and that "[g]oing forward, [the company] plan[s] to report the operations and dispositions from [its] Core Portfolio and the Legacy, Non-Strategic Portfolio separately." Colony Credit further announced that in connection with this bifurcation plan, it had amended the management agreement with the subsidiary of Colony Capital that managed Colony Credit, resulting in a reduction of the base management fee by $13 million per year.

6. On November 8, 2019, Colony Capital announced its financial results for the third quarter of 2019. Among other results, the Company reported a GAAP net loss of $555 million, or $1.15 per share, which "notably included reductions of goodwill, impairments of real estate and provision for loan losses totaling $540.3 million . . . of which $387.0 million was attributable to the reduction of goodwill primarily as a result of the pending sale of the Company's industrial investment management business and related real estate portfolio, and the decrease in management fees from Colony Credit Real Estate, Inc. . . . resulting from impairments related to its portfolio bifurcation."

7. On this news, Colony Capital's stock price fell $0.48 per share, or 8.76%, to close at $5.00 per share on November 8, 2019.

8. Then, on May 8, 2020, Colony Capital issued a press release announcing its financial and operating results for the first quarter of 2020. In the press release, Colony reported that its portfolio companies had defaulted on $3.2

billion of debt secured by hotels and healthcare-related properties and that Colony had received a notice of acceleration covering $780 million of the defaulted debt.

9. On this news, Colony Capital's stock price fell $0.08 per share, or 3.81%, to close at $2.02 per share on May 8, 2020.

10. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's financial condition and operations. Among other things, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Colony Capital's anticipated sale of its industrial real estate portfolio and the bifurcation of Colony Credit's portfolio were foreseeably likely to materially reduce Colony Capital's future investment management fee income and would require Colony Capital to impair goodwill by hundreds of millions of dollars; (ii) certain assets of Colony Capital's remaining portfolio companies carried unsustainable levels of debt secured by hotels and healthcare-related properties and were at a significant risk of default; and (iii) as a result, the Company's public statements misrepresented the Company's true financial condition, likely future cash flows and income, liquidity, and credit risks.

11. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II. <u>JURISDICTION AND VENUE</u>

12. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

13. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

14. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) as the Company conducts business and maintains facilities within this judicial district.

15. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

16. Lead Plaintiffs James Alpha Funds, as set forth in their previously filed PSLRA certification (ECF No. 33-2), incorporated by reference herein, purchased Colony common stock during the Class Period and suffered damages as a result of the violation of federal securities laws and false and/or misleading statements and/or material omissions alleged herein.

17. Defendant Colony Capital is a Maryland corporation with its principal executive offices located at 515 South Flower Street, 44th Floor, Los Angeles, California 90071. Colony Capital's securities trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "CLNY." As used herein, "Colony Capital" refers to both Colony Capital, Inc. and its various predecessor entities, while "Colony" refers to both Colony Capital and its affiliates. *See infra* at ¶¶ 24-26.

18. Defendant Thomas J. Barrack, Jr. ("Barrack") served as Colony Capital's Chief Executive Officer ("CEO") and the Executive Chairman of its Board of Directors at all relevant times (including the entirety of the Class Period). He founded Colony Capital in 1991 and has served as a member of its Board of Directors since 2009. He was appointed as Colony Capital's CEO effective as of

November 5, 2018 and served in that role until July 1, 2020.[1] Barrack continued to serve as Executive Chairman of Colony Capital's Board of Directors after stepping down from his role as CEO. Prior to founding the Colony business in 1991, Barrack was a Principal with the Robert M. Bass Group, the principal investment vehicle of the Fort Worth, Texas investor Robert M. Bass. Prior to joining the Robert M. Bass Group, Barrack served in the Reagan administration as Deputy Undersecretary of the Department of the Interior. Barrack also has served as a director for a number of publicly traded companies, including First Republic Bank (June 2010 to February 2020), Colony Starwood Homes (Co-chairman, January 2016 to June 2017), Carrefour S.A. (January 2014 to May 2016), Accor, S.A. (January 2006 to April 2013), Challenger Financial Services Group Limited (November 2007 to October 2010), and Continental Airlines, Inc. (August 1994 to September 2007). Barrack received a bachelors degree from the University of Southern California, a juris doctor from the University of San Diego Law School, and an honorary doctorate of jurisprudence from Pepperdine University.

19. Defendant Mark M. Hedstrom ("Hedstrom") served as Colony Capital's Chief Financial Officer ("CFO"), Treasurer, Executive Vice President, and Chief Operating Officer ("COO") at all relevant times (including the entirety of the Class Period). Hedstrom served as Colony Capital's CFO and Treasurer from January 1, 2019 through July 1, 2020.[2] Hedstrom has served as Colony Capital's Executive Vice President and COO since at least 2017, and he has continued to serve in these roles after stepping down from his roles as CEO and Treasurer in July 2020. In addition, Hedstrom became a member of the board of directors of Colony Credit Real Estate, Inc. in May 2020, and he is now the chairman of that board of

---

[1] On March 12, 2020, Colony Capital announced that Marc Ganzi had been designated as Colony Capital's next CEO, effective as of July 1, 2020.

[2] On March 1, 2020, Colony Capital announced that Jacky Wu had been appointed as Colony Capital's next CFO, effective as of July 1, 2020.

directors. Hedstrom also has served as Vice President of CLNC Manager, LLC (starting no later than January 31, 2018 and continuing until at least November 6, 2019). Prior to the combination of Colony Capital, LLC and Colony Financial, Inc. into a predecessor Colony Capital in 2015, Hedstrom was the global Chief Financial Officer for Colony Capital, LLC. In that role he was responsible for management of the financial and operating aspects of its funds management business, which included oversight of Colony Capital LLC's financial, human resources, information technology, risk management and investor reporting functions. Prior to joining the Colony Capital business in 1993, Hedstrom held senior positions with Koll International and Castle Pines Land Company. Hedstrom spent five years with Ernst & Young, where he was a Senior Manager. Hedstrom is a certified public accountant (license inactive) and received a bachelors degree in accounting from the University of Colorado.

20. Defendant Darren J. Tangen ("Tangen") served as Colony Capital's President from November 5, 2018 through April 10, 2020. In addition, Tangen served on the board of directors of Colony Credit Real Estate, Inc. from January 2018 through May 2020. Since 2002, Tangen held various senior investment related roles at Colony Capital and its predecessors, including Executive Vice President, Chief Financial Officer and Treasurer. Tangen was one of the key executives (Chief Financial Officer and Chief Operating Officer) responsible for Colony Financial, Inc., having taken the company public in 2009 and leading it through its combination with Colony Capital, LLC in 2015. Prior to joining Colony Capital in 2002, Tangen held positions at Credit Suisse and Colliers International. Tangen received his bachelors degree in commerce from McGill University and his M.B.A. in Finance and Real Estate at The Wharton School, University of Pennsylvania.

21. Defendants Barrack, Hedstrom, and Tangen are sometimes referred to herein as the "Individual Defendants."

22. The Individual Defendants possessed the power and authority to control

the contents of Colony Capital's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Colony Capital's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Colony Capital, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV. STATEMENT OF FACTS

### A. Background Of Colony Capital's Business

23. Colony Capital is a leading global investment management firm. As of June 30, 2019, Colony Capital had assets under management of approximately $55 billion. The Company manages capital on behalf of its stockholders, as well as institutional and retail investors in private funds, and traded and non-traded real estate investment trusts.

24. Colony Capital was founded in 1991. The firm went public in 2015 through a combination with Colony Financial, Inc., after which the Company traded on the NYSE under the ticker symbol "CLNY." In 2017, Colony Capital merged with NorthStar Asset Management Group Inc. and NorthStar Realty Finance Corp., forming Colony Northstar, Inc. ("Colony Northstar"), which traded on the NYSE under the ticker symbol "CLNS." In 2018, Colony Northstar changed its name back to Colony Capital, Inc. and continued to trade on the NYSE, going back to the ticker symbol "CLNY." Colony Capital operates its business as, and is taxed as, a Real Estate Investment Trust ("REIT").

25. Colony Credit Real Estate, Inc. ("Colony Credit" or "CLNC") is a publicly traded commercial real estate credit REIT, which trades on the NYSE under ticker symbol "CLNC." Colony Credit (then-named Colony NorthStar Credit Real Estate, Inc.) was formed on January 31, 2018 through a contribution of Colony Capital's interests in certain of its investment entities, and a concurrent merger with NorthStar Real Estate Income Trust, Inc. and NorthStar Real Estate Income II, Inc., both publicly registered non-traded REITs sponsored by Colony Capital. In June 2018, Colony NorthStar Credit Real Estate, Inc. changed its name to Colony Credit Real Estate, Inc. (As used herein, "Colony Credit" refers to both Colony Credit Real Estate, Inc. and Colony NorthStar Credit Real Estate, Inc.) Colony Capital owns a 36% interest in Colony Credit.

26. CLNC Manager, LLC ("CLNC Manager") is a Delaware limited liability company and a wholly-owned and indirect subsidiary of Colony Capital. CLNC Manager acts as the investment manager for Colony Credit, and Colony Capital thereby derives income from investment management fees paid by Colony Credit to CLNC Manager. CLNC Manager entered into a Management Agreement dated January 31, 2018 (the "Original Management Agreement") with Colony Credit and Credit RE Operating Company, LLC, which set forth the terms of the investment management relationship between CLNC Manager and Colony Credit. Defendant Hedstrom signed the Original Management Agreement on behalf of CLNC Manager as its Vice President. CLNC Manager entered into an Amended and Restated Management Agreement dated November 6, 2019 (the "Amended Management Agreement") with Colony Credit and Credit RE Operating Company, LLC, which set forth the amended and restated terms of the investment management relationship between CLNC Manager and Colony Credit. Defendant Hedstrom signed the Amended Management Agreement on behalf of CLNC Manager as its Vice President.

27. In July 2019, Colony Capital acquired Digital Bridge Holdings, LLC ("Digitial Bridge" or "DBH"). According to Colony Capital's Form 10-K for the year ended December 31, 2019 (the "2019 10-K"), filed on March 2, 2020, "DBH is an investment manager dedicated to digital real estate and infrastructure, managing approximately $14 billion of assets under management . . . and approximately $7 billion of fee earning equity under management . . . across six separately capitalized and managed portfolio companies and the $4 billion Digital Colony Partners fund . . . ." According to the 2019 10-K, the purpose of the Digital Bridge acquisition was to execute the Company's "vision . . . to establish the Company as a leading owner, operator and investment manager of digital infrastructure and real estate." The Company further stated that Colony Capital was "currently the only global REIT that owns, manages, and/or operates across all major infrastructure components of the digital ecosystem including data centers, cell towers, fiber networks and small cells."

28. In Colony Capital's Form 10-K for the year ended December 31, 2018 (the "2018 10-K"), filed with the SEC on March 1, 2019, the Company stated that it conducted its business in six reportable segments: (1) Healthcare, (2) Industrial, (3) Hospitality, (4) CLNC, (5) Other Equity and Debt, and (6) Investment Management. In its 2019 10-K, the Company stated that it conducted its business in seven reportable segments: (1) Digital Real Estate and Investment Management ("Digital"), (2) Healthcare, (3) Industrial, (4) Hospitality, (5) CLNC, (6) Other Equity and Debt, and (7) Other Investment Management.

### B. Colony Capital Announces Sale Of Industrial Portfolio As Part Of Strategic Transition To Digital Infrastructure Company

29. The Class Period begins on August 9, 2019, when Colony Capital issued a press release during pre-market hours announcing its financial and operating results for its second fiscal quarter ended June 30, 2019 (the "Q2 2019 Press Release"). In the Q2 2019 Press Release, the Company disclosed that it had

conducted a strategic asset review as part of the Company's "strategic evolution" into a digital infrastructure company and that, as part of this strategic asset review, the Company retained third party advisers to market the Company's multi-billion dollar industrial portfolio for sale. Specifically, the Q2 2019 Press Release stated:

> ***As part of our ongoing strategic review***, described in more detail herein, ***the Company engaged advisors to market its light industrial portfolio*** consisting of approximately 450 properties and approximately 60 million square feet of space; ***the Company expects to generate a significant gain given the current strength in the industrial investment sales market***; ***assets and liabilities of the Industrial segment are presented as held for sale on the balance sheet, and all revenues, costs and expenses are combined on the income statement under the category of discontinued operations***.
>
> ***
>
> **Strategic Asset Review Update**
>
> ***As part of a comprehensive review undertaken by management together with our Strategic Asset Review Committee and an independent advisor,*** which was unanimously supported by the Company's Board of Directors, ***the Company has undertaken certain strategic initiatives*** intended to build on core investment management competencies while focusing on high-growth businesses. ***A key component of this strategic evolution was the Company's recent acquisition of DBH, a leading investment manager of digital infrastructure investments*** dedicated to the next generation of mobile and internet connectivity, which also addresses CEO succession plans. These previously announced and/or completed initiatives also include the anticipated termination of the Company's management agreement with NRE in connection with the pending sale of the company, a corporate restructuring and reorganization plan that is on track with its cost savings objectives, the stabilization of the healthcare portfolio's capital structure, the acquisition of a high growth Latin American private equity platform, and the formation of investment management platforms addressing innovative energy investments and a data-driven REIT public securities platform.

> ***Additionally, the Company has engaged advisors to market the Company's multi-billion dollar industrial portfolio for sale, which may include the related management platform. There has been significant appreciation in the value of our industrial portfolio driven by favorable operating fundamentals and strong investor demand for light industrial assets. As a result, a sale of the industrial portfolio may yield a price higher than the value that may be ascribed by the market to the industrial portfolio as part of the Company's overall valuation***. The Company is seeking to complete a sale by the end of 2019, however, no assurances can be made that a sale can be completed within the timeframe contemplated, or at all. In addition, the Company continues to monetize non-strategic Other Equity and Debt investments and other non-core assets to generate liquidity and simplify the business. With these anticipated proceeds, the Company may redeploy a portion of the proceeds into higher total return strategies (e.g. digital infrastructure, emerging markets and energy) and may further consider the reduction of corporate leverage.[3]

30. As reflected in the excerpt of the Q2 2019 Press Release quoted above, Colony Capital touted the benefits of the contemplated sale of the industrial portfolio, representing that "the Company ***expects to generate a significant gain*** given the current strength in the industrial investment sales market . . . ."

31. Similarly, in an earnings call on the same day, in response to a question from an analyst concerning the basis for the sale of the industrial portfolio, Defendant Tangen stated:

> Given what our cost basis is in that portfolio we -- and given where market values have gone, we would expect to realize a meaningful both accounting as well as taxable gain if we sort of sell where we're seeing other trades occur in the marketplace. So, as Tom said, more to come on that. We're mid-sale process. So, it's a little early to give guidance on that. ***But we would expect that there will be a pretty meaningful gain at the end of the day.***

[3] Unless otherwise noted, all emphasis in this Complaint has been added.

32. On that same call, in response to a question from an analyst concerning potential expected impairments in future quarters, Defendant Hedstrom stated:

> Look, as we realize small assets and as we call portfolios in our Healthcare and hospitality segments that aren't held for sale, there is going to be noise and there's going to be gains and losses in those transactions as we go. ***I don't think that in -- for the year, we don't think that those gains and losses are that material to the operations of the business.***

33. Taken together, Defendants' statements misleadingly suggested that the anticipated sale of the industrial portfolio would provide the Company with realization of a substantial gain but would not be accompanied by material impairments elsewhere to the Company's balance sheet. In connection with the strategic review process that led to the Company's decision to market the industrial portfolio for sale, however, Defendants became aware that (1) the sale of the industrial portfolio would cause the Company to lose substantial income as a result of losing future investment management fee income; and (2) this loss of future fee income would require the Company to record a material impairment to its goodwill relative to the investment management segment.

34. On August 9, 2019, the Company also filed with the SEC its Form 10-Q for the second fiscal quarter ended June 30, 2019 (the "Q2 2019 10-Q"). In the Q2 2019 10-Q, the Company disclosed that it had assigned $20 million of goodwill to the industrial portfolio held for sale. Specifically, under Note 6 to the Consolidated Financial Statements (entitled "Goodwill, Deferred Leasing Costs and Other Intangibles"), the Q2 2019 10-Q stated, "Goodwill balance of $1.5 billion at June 30, 2019 and December 31, 2018 resides in the investment management segment. Goodwill assigned to the industrial segment of $20.0 million is classified as held for sale (Note 7)."

35. Under Note 7 to the Consolidated Financial Statements (entitled "Assets and Liabilities Held for Sale"), the Q2 2019 10-Q listed $20 million of goodwill under assets and liabilities held for sale.

36. The statements in ¶¶ 34-35 were misleading because they suggested that the amount of goodwill that the Company would relinquish in connection with the anticipated sale of the industrial portfolio was $20 million and that there would not be further reductions of goodwill in connection with the transaction.

37. Concurrently with Colony Capital's strategic asset review, Colony Credit was also conducting a strategic asset review, resulting in a plan to bifurcate the assets of Colony Credit into a core portfolio of assets (that Colony Credit intended to grow) and a legacy, non-strategic portfolio of assets (that Colony Credit intended to monetize and reinvest into the core portfolio). Defendants were aware of this bifurcation plan as a result of their oversight of the entire strategic asset review process and their overlapping roles at Colony Capital, Colony Credit and other Colony affiliates (including, *inter alia*, Defendant Hedstrom's role as Vice President of CLNC Manager). Defendants were further aware that (1) Colony Credit's bifurcation plan would result in a substantial reduction of investment management fee income historically paid to CLNC Manager, and (2) this loss of future fee income would require that the Company record a material impairment to its goodwill for the investment management segment. Defendants, however, failed to disclose this foreseeable consequence of the bifurcation plan until the next quarter.

38. Furthermore, in connection with Colony Capital's strategic asset review, Defendants determined that once the Colony Capital sold its industrial real estate portfolio, certain assets of Colony Capital's remaining portfolio companies carried unsustainable levels of debt secured by hotels and healthcare-related properties and were at a significant risk of default.

39. In connection their various statements on August 9, 2019, Defendants failed to disclose the nature of the adverse material consequences expected to arise from the planned strategic initiatives and, instead, presented a one-half narrative focusing only on the expected benefits of the anticipated sale of the industrial portfolio while minimizing the impact of future impairments that Defendants knew would be material.

**C. Colony Capital Announces Consummation Of Agreement To Sell Industrial Portfolio And Affiliated Operating Platform**

40. On September 30, 2019, Colony Capital issued a press release (the "September 2019 Press Release") announcing that it had entered into a definitive agreement with Blackstone through which Blackstone would acquire Colony Industrial, the industrial real estate assets and affiliated industrial operating platform of Colony Capital, for an aggregate purchase price of $5.9 billion. The September 2019 Press Release touted the sale's benefits, stating, *inter alia*:

> Darren Tangen, President of Colony Capital, stated, "We appreciate Blackstone has recognized the value that we've created at Colony Industrial and they are the ideal steward to lead this business during the next phase of its growth. Lew Friedland and the Colony Industrial team have executed flawlessly, achieving and even surpassing the goals of our original investment thesis five years ago. ***This sale allows Colony to both achieve compelling returns for our investors and generate significant liquidity, which among other uses, will help accelerate our ongoing transition into digital real estate and infrastructure***."

41. In Defendants' September 30, 2019 statements, Defendants failed to disclose the information omitted from their earlier August 9, 2019 statements and continued to present a misleading narrative focusing only on the expected benefits of the industrial sale while failing to disclose offsetting adverse material consequences expected to arise from the intended strategic initiatives.

**D. The Truth Begins To Emerge: First Partial Corrective Disclosure**

42. On November 7, 2019, after market close, Colony Credit (*i.e.*, CLNC) issued a press release announcing its financial and operating results for the third fiscal quarter ended September 30, 2019 (the "Colony Credit Press Release"). In the Colony Credit Press Release, Colony Credit announced that it had bifurcated its assets into a core portfolio and a legacy, non-strategic portfolio. In relevant part, the press release stated:

> Kevin P. Traenkle, President and Chief Executive Officer of Colony Credit Real Estate, commented, "For several reasons, the third quarter has been a landmark period for the Company. First, our Core Portfolio and primary business of providing high-quality commercial real estate loans continues to grow and perform well, as evidenced by over $480 million of new quarterly originations. Additionally, we successfully closed an accretive $1 billion CLO financing in October, opening new sources of capital, de-risking our balance sheet and increasing our return on equity."
>
> Mr. Traenkle added, "***However, and more importantly, we made great strides in advancing our strategic plan to bifurcate our Company's assets into our Core Portfolio, which we plan to grow, and a Legacy, Non-Strategic Portfolio, which we plan to monetize and reinvest into our Core Portfolio. As part of this undertaking and with the full support of our Board, third party valuation experts assisted the Company in a robust strategic reassessment of our entire asset base. During this process we identified and separated a Legacy, Non-Strategic Portfolio and made meaningful changes to the original business plans. Going forward, we plan to report the operations and dispositions from our Core Portfolio and the Legacy, Non-Strategic Portfolio separately***."
>
> Mr. Traenkle continued to add, "***Due to the changes we have made to the business plans of investments within our Legacy, Non-Strategic Portfolio, the Company meaningfully reduced its book value to better reflect the market value of such assets*** and also reset its dividend to a level which is now fully covered by in-place Core Earnings from the Core Portfolio alone. We expect most of the Legacy, Non-Strategic Portfolio to be monetized in the short to medium term and the proceeds of such sales will provide capital to grow our Core Earnings within our

> Core Portfolio. I strongly encourage all to review our portfolio bifurcation presentation and quarterly financial and supplemental materials, with substantially enhanced details and disclosures. Based on the results of this analysis, we believe the Company's current net asset value and book value are significantly higher than current trading value."

43. In addition, the Colony Credit Press Release disclosed that, in connection with the bifurcation plan, Colony Credit and CLNC Manager had amended and restated the management agreement to reduce the base management fee by $13 million per year. Specifically, the press release stated:

> Subsequent to quarter end, the Company's manager, a subsidiary of Colony Capital, Inc. and the Company ***revised the terms of the management agreement in connection with CLNC's portfolio bifurcation plan and related impairments, which will result in a reduction to the fee base*** by accumulated unrealized provisions for loan losses and real estate impairments to date. ***Such reduction will be effective during the fourth quarter 2019 and result in a $13 million decrease of the annual base management fee paid by the Company*** . . . .

44. The next morning, on November 8, 2019, during pre-market hours, Colony Capital issued a press release announcing its financial and operating results for the third fiscal quarter ended September 30, 2019 (the "Q3 2019 Press Release"). Among other results, the Company reported a GAAP net loss of $555 million, or $1.16 per share, which "notably included reductions of goodwill, impairments of real estate and provision for loan losses totaling $540.3 million . . . of which $387.0 million was attributable to the reduction of goodwill primarily as a result of the pending sale of the Company's industrial investment management business and related real estate portfolio, and the decrease in management fees from Colony Credit Real Estate, Inc. . . . resulting from impairments related to its portfolio bifurcation . . . ."

45. On this news, Colony Capital's stock price fell $0.48 per share, or 8.76%, to close at $5.00 per share on November 8, 2019.

46. Later on November 8, 2019, after the market closed, Colony Capital filed its Form 10-Q for the third fiscal quarter ended September 30, 2019 (the "Q3 2019 10-Q"), which provided further details concerning the nature and components of the impairments. In the Q3 2019 10-Q, the Company stated:

> In the third quarter of 2019, the Company considered the loss of future fee income that is expected to result from the pending sale of its industrial business and the amendment of Colony Credit's management agreement to reduce the fee base to reflect Colony Credit's reduced book value, as indicators of potential impairment to its investment management goodwill. The Company updated its quantitative test of goodwill in the third quarter, which indicated that the carrying value of the investment management reporting unit at September 30, 2019, including goodwill, exceeded its estimated fair value. As a result, the Company recognized a goodwill impairment of $387.0 million in the third quarter of 2019.

47. With respect to the Colony Credit bifurcation plan, the Q3 2019 10-Q further stated:

> As part of Colony Credit's strategic plan, in the third quarter of 2019, Colony Credit bifurcated its assets into a core portfolio and a legacy, non-strategic portfolio, which will allow Colony Credit to focus on the divestment of its legacy, non-strategic portfolio and to redeploy into and grow its core portfolio. In conjunction with its focus on its core portfolio, Colony Credit meaningfully reduced the book value of its legacy, non-strategic assets to better reflect its market value and reset its annualized dividend from $1.74 per share to $1.20 per share. As a result of the meaningful reduction to Colony Credit's book value, in November 2019, the Company amended its management agreement with Colony Credit to reduce the fee base to reflect Colony Credit's reduced book value, which will result in a decrease in management fees to the Company effective in the beginning of the fourth quarter of 2019.

48. With respect to the amendment of the Colony Capital management agreement and the reduction of the fee base, the Q3 2019 10-Q stated:

> Colony Credit—1.5% per annum of Colony Credit's stockholders' equity (as defined in its management agreement). ***In November 2019, the management agreement with Colony Credit was amended and restated to reduce the fee base to reflect Colony Credit's reduced book***

> ***value, which will result in a decrease in management fees to the Company effective in the beginning of the fourth quarter of 2019*** . . . .

**E. Defendants' Further Misleading Statements On The Q3 2019 Earnings Call**

49. While the impairments disclosed by Colony Capital on November 8, 2019 in connection with the release of its Q3 2019 results removed some of the inflation in the Company's stock price, the Company's stock price nonetheless continued to trade at artificially inflated prices throughout the remainder of the Class Period as a result of Defendants' continued misstatements and omissions concerning the financial health of the Company, its liquidity and debt position, and the financial health and stability of the Company's portfolio companies.

50. For example, on November 8, 2019, Colony Capital hosted an earnings call with investors and analysts. While providing an overview of the financial and operating results of the third quarter of 2019, Defendant Barrack represented that the sale of the industrial portfolio was expected to provide the Company with substantial liquidity, stating:

> Now looking ahead. Sale at industrial is anticipated to generate roughly $1.2 billion in net equity proceeds to Colony Capital, and we expect this transaction to close by year-end. ***As a result of the sale and other monetizations referenced earlier, Colony Capital will be equipped with a substantial quantum of liquidity at what we think will be a very appropriate time.***

51. In addition, while providing an overview of the Company's financial results for the quarter, Defendant Hedstrom explained that the Company had completed a major refinancing that had addressed all near-term healthcare real estate loan maturities. Specifically, he stated:

> On the financing front, we refinanced $212 [sic] million British pound loan on a portfolio of UK senior housing assets, with a new GBP 223 million, fully extended five-year loan at a substantially reduced interest rate. ***This refinancing, along with previously completed refinancing***

> ***transactions this year, addresses all near-term healthcare real estate loan maturities***.

52. These statements were misleading because they failed to disclose, *inter alia*, that following the sale of the industrial portfolio, certain assets of Colony Capital's remaining portfolio companies carried unsustainable levels of debt secured by hotels and healthcare-related properties and were at a significant risk of default.

### F. Defendants' Misleading Statements In Connection With The Release Of Colony Capital's Q4 2019 And FY 2019 Results

53. On February 28, 2020, Colony Capital issued a press release during pre-market hours announcing its financial and operating results for its fourth fiscal quarter and full year ended December 31, 2019 (the "Q4 2019 Press Release"). With respect to hospitality and healthcare, the Q4 2019 Press Release stated that the Company had "[r]efinanced a £212 million loan on a U.K. portfolio of senior housing assets and a $48 million loan on skilled nursing facilities portfolios, which, together with previously completed refinancing transactions in 2019, ***addresses all material near-term healthcare real estate loan maturities***."

54. In addition, the Q4 2019 Press Release stated: "***[w]ith respect to the healthcare and hospitality units, the Company successfully addressed all material near-term debt maturities*** allowing the respective business unit leaders to focus on improving cash flows through operational management and capital expenditures."

55. That same day, Colony Capital hosted an earnings call with investors and analysts. While providing an update of the Company's financial and operating performance of the fourth quarter of 2019, Defendant Barrack stated:

> Healthcare, we refinanced an aggregate $2.2 billion of debt, including $1.725 billion [in AGAR] loan refinancing. ***That address[ed] all of our material near-term maturities and puts us in a very good shape***.
>
> In addition, we've sold three hospitals, generating $88 million of equity proceeds.

56. In addition, while providing an overview of the Company's financial results for Q4, Defendant Hedstrom similarly stated:

> Moving to the healthcare real estate segment. The fourth quarter included a onetime recovery of rent receivables and termination fees, which resulted in an 11% same-store portfolio NOI increase from the third quarter. Excluding these onetime items, same-store NOI was flat. Same-store portfolio full year 2019 NOI was also flat compared to 2018. There were two significant transactions on the healthcare financing front. We refinanced the GBP 212 million loan on a portfolio of UK senior housing assets with a new GBP 223 million fully extended five-year loan at a substantially reduced interest rate. Additionally, we put in place a $48 million loan on a skilled nursing facility, lengthening the fully extended maturity date to 2024 at a similar interest rate. ***These refinancings, along with previously completed refinancing transactions in 2019, address all near-term healthcare real estate loan maturities, which was a key 2019 objective***.

57. Finally, when asked about special dividends, Defendant Barrack stated, in relevant part:

> The legacy businesses are stabilized, they're doing actually better than we anticipated in a different way. So, one time when we talk about special dividend, we've got hospitality and healthcare, ***we trimmed out debt to stabilize the income stream, other than the last week, and with ramifications of coronavirus and the volatility in this market are, we're comfortable keeping that cash flow going as we transition. And depending on what happens with CLNC, we always have that as an added liquidity device*** to by either special dividend to convert into cash to do the other things that we've always said that we'll analyze, buying back stock, trim the down the balance sheet, utilize for greater digital acquisitions. But ***we've got plenty of liquidity***.

58. Defendant Barrack's reference to the events of "last week" and the "ramifications of coronavirus and the volatility in this market" provide essential context to Defendants' representations about the sufficiency of the Company's liquidity and the Company's position with respect to material near-term debt maturities. At the time these statements were made—Friday, February 28, 2020—

stock markets worldwide were being devastated by historic losses due to mounting worries about the coronavirus, resulting in the largest single-week declines since the 2008 financial crisis. The day before this earnings call, the Dow had plunged 1,200 points, its biggest single-day point drop in history. Concerns were particularly acute with respect to the travel and hospitality industries. For example, the Washington Post published an article on February 28 entitled, "Companies are canceling U.S. domestic travel over coronavirus fears." It stated, "Major companies are beginning to cancel conferences and travel plans within the United States due to the coronavirus, ***which analysts warn will have cascading impacts on the country's hotels, airlines and convention centers***." For Defendants to confidently report that, notwithstanding this environment, Colony Capital (1) had "plenty of liquidity," (2) had "addressed all . . . material near-term maturities" in the healthcare and hospitality segments, and (3) was in "very good shape" with respect to its debt position, was highly misleading given the outstanding billions of dollars of debt secured by hotels and healthcare-related properties that Colony Capital owed and as to which it was obligated to make payments over the next 90 days.

59. On March 2, 2020, Colony Capital filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K contained the following representations with respect to the condition of its portfolio of companies in the healthcare and hospitality segments:

> ***<u>With respect to the healthcare and hospitality segments, the Company successfully addressed all material near-term debt maturities</u>, allowing the respective business unit leaders to focus on improving cash flows through operational management and capital expenditures.*** The Company does not currently anticipate significantly shortened hold periods for its healthcare and hospitality assets solely as a result of its current strategy to focus on digital real estate and infrastructure. Holding periods will depend, in part, on prevailing economic conditions and market opportunities as they arise. ***In the fourth quarter of 2019, the Company continued to perform its***

> ***impairment assessment of healthcare and hospitality assets in accordance with its policies and in the normal course of business, and applied its best estimate at this time based upon undiscounted future net cash flows to be generated by these assets over a long-term hold.***

60. Just as with the statements made on February 28, 2020, the statement in the 2019 10-K that the Company had "successfully addressed all material near-term debt maturities" was materially misleading at the time it was made.

### G. The Truth Fully Emerges: Second Partial Corrective Disclosure

61. On May 8, 2020, only two months after the Annual Report, Colony Capital issued a press release announcing its financial and operating results for the first quarter of 2020 ("Q1 2020 Press Release"). In the Q1 2020 Press Release, Colony Capital reported that its portfolio companies had ***defaulted on $3.2 billion of debt secured by hotels and healthcare-related properties*** and that Colony Capital had ***received a notice of acceleration covering $780 million of the defaulted debt***.

62. On this news, Colony Capital's stock price fell $0.08 per share, or 3.81%, to close at $2.02 per share on May 8, 2020.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A. Defendants' False And Misleading Statements To The Public On August 9, 2019

63. The Class Period begins on August 9, 2019, when Colony Capital issued its Q2 2019 Press Release. The Q2 2019 Press Release also announced the Company's intended sale of its multi-billion-dollar industrial portfolio, stating, in relevant part:

> ***As part of our ongoing strategic review***, described in more detail herein, ***the Company engaged advisors to market its light industrial portfolio*** consisting of approximately 450 properties and approximately 60 million square feet of space; ***the Company expects to generate a significant gain given the current strength in the industrial investment sales market***; assets and liabilities of the Industrial segment

> are presented as held for sale on the balance sheet, and all revenues, costs and expenses are combined on the income statement under the category of discontinued operations.
>
> ***
>
> ***Additionally, the Company has engaged advisors to market the Company's multi-billion dollar industrial portfolio for sale, which may include the related management platform. There has been significant appreciation in the value of our industrial portfolio driven by favorable operating fundamentals and strong investor demand for light industrial assets. As a result, a sale of the industrial portfolio may yield a price higher than the value that may be ascribed by the market to the industrial portfolio as part of the Company's overall valuation***. The Company is seeking to complete a sale by the end of 2019, however, no assurances can be made that a sale can be completed within the timeframe contemplated, or at all.

64. That same day, Colony Capital hosted an earnings call with investors and analysts. While providing an overview of the Company's financial and operating results for the second quarter of 2019, Defendant Barrack stated, in relevant part:

> In Healthcare. What we said, we said we would successfully address the significant healthcare loan maturities in 2019 including the $1.725 billion GAHR loan and co-assets to better position our portfolio for strategically alignment. What we have done, we consummated an important partnership with Ventas, a leading health care REIT and refinanced the $1.725 billion GAHR debt on attractive terms and significantly derisked our Healthcare vertical.
>
> Four of six 2019 loan maturities have now been refinanced and the remaining two are expected to be refinanced or otherwise resolved by the year-end. 2019 was the year of liability management for health care, which has gone extremely well.
>
> ***
>
> Given the significant appreciation and demand for industrial assets, we've decided that we are at an appropriate time to harvest our Industrial Real Estate business. We formally launched the sale process for our Industrial business. Should we receive offers at compelling

> levels, we anticipate a closing around year-end. In the meantime, we continue to build and expand the portfolio, as is evidenced by our recent Dermody acquisition of almost 12 million square feet at an acquisition cost of $1.2 billion.

65. In addition, when providing an overview of the Company's financial results for the quarter, Defendant Hedstrom stated, in relevant part:

> Starting with the Healthcare Real Estate segment. Same-store portfolio NOI increased 1% compared to first quarter 2019. On the financing front, we refinanced on very favorable terms, $1.7 billion in health care debt which was scheduled to mature in December 2019. We contributed $175 million of equity primarily to reduce the loan balance, and we expect that amount to decrease to approximately $90 million on a net basis following the sale of certain assets that were previously encumbered by the original debt and are presently under contract to be sold. This refinancing, along with previously completed refinancing transactions earlier this year, addresses 4 of the 6 health care loans maturing in 2019 or 87% of the consolidated outstanding principal balances. The remaining 2 health care loans are expected to be refinanced or repaid by year-end. And with these health care maturities addressed, we can dedicate our focus entirely to operations and strategy to maximize value within our portfolio.

66. In addition, when asked about the basis for the sale of the industrial portfolio, Defendant Tangen stated, in relevant part:

> Given what our cost basis is in that portfolio we -- and given where market values have gone, we would expect to realize a meaningful both accounting as well as taxable gain if we sort of sell where we're seeing other trades occur in the marketplace. So, as Tom said, more to come on that. We're mid-sale process. So, it's a little early to give guidance on that. ***But we would expect that there will be a pretty meaningful gain at the end of the day.***

67. Further, when asked a question about expected impairments, Defendant Hedstrom responded, in relevant part, as follows:

> Analyst: . . . I think you mentioned during the call a bunch of the impairments were somewhat aligned with expectations. It seems like some of these impairments may be in line with your expectations but just not the investors and us. So how much more of this can we expect?

> It seems like every quarter or every couple of quarters, pretty significant amount of impairments are realized. How much more is out there?
>
> Hedstrom: I'll take that one. Look, as we realize small assets and as we call portfolios in our Healthcare and hospitality segments that aren't held for sale, there is going to be noise and there's going to be gains and losses in those transactions as we go. ***I don't think that in -- for the year, we don't think that those gains and losses are that material to the operations of the business***.

68. That same day, Colony Capital filed its Q2 2019 10-Q. The Q2 2019 10-Q was signed by Defendants Barrack and Hedstrom. The Q2 2019 10-Q stated, in relevant part:

> ... the Company has engaged advisors to market the Company's multibillion dollar industrial portfolio for sale, which may include the related management platform. There has been significant appreciation in the value of the industrial portfolio driven by favorable operating fundamentals and strong investor demand for light industrial assets. As a result, a sale of the industrial portfolio may yield a price higher than the value that may be ascribed by the market to the industrial portfolio as part of the Company's overall valuation. The Company is seeking to complete a sale by the end of 2019, however, no assurances can be made that a sale can be completed within the time frame contemplated, or at all. If a sale is completed, the Company may redeploy a portion of the proceeds into higher total return strategies (e.g., digital infrastructure, emerging markets and energy) and may further consider the reduction of corporate leverage. The planned sale of the industrial segment, including its related management platform, represents a strategic shift that will have a major effect on the Company's operations and financial results, and has met the criteria as held for sale and discontinued operations. Accordingly, for all current and prior periods presented, the related assets and liabilities are presented as assets and liabilities held for sale on the consolidated balance sheets (Note 7) and the related operating results are presented as income from discontinued operations on the consolidated statement of operations (Note 15).

69. Additionally, under Note 6 to the Consolidated Financial Statements (entitled "Goodwill, Deferred Leasing Costs and Other Intangibles"), the Q2 2019

10-Q stated, "Goodwill balance of $1.5 billion at June 30, 2019 and December 31, 2018 resides in the investment management segment. Goodwill assigned to the industrial segment of $20.0 million is classified as held for sale (Note 7)."

70. Furthermore, under Note 7 to the Consolidated Financial Statements (entitled "Assets and Liabilities Held for Sale"), the Q2 2019 10-Q listed $20 million of goodwill under assets and liabilities held for sale.

71. The statements in ¶¶ 63-70 were materially false and/or misleading and/or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose the following adverse facts:

(1) Colony Capital's anticipated sale of its industrial real estate portfolio and the bifurcation of Colony Credit's portfolio were foreseeably likely to materially reduce Colony Capital's future investment management fee income and would require Colony Capital to impair goodwill by hundreds of millions of dollars;

(2) By touting the benefits of the anticipated sale of the industrial real estate portfolio without disclosing the expected impacts of the transaction on Colony's projected income and goodwill, Defendants created a distorted impression of the net impacts of the transaction on the Company's financial and operating results;

(3) Certain assets of Colony Capital's remaining portfolio companies carried unsustainable levels of debt secured by hotels and healthcare-related properties and were at a significant risk of default; and

(4) As a result of the foregoing, the Company's public statements misrepresented the Company's true financial condition, likely future cash flows and income, liquidity, and credit risks.

72. In addition, the statements in ¶¶ 69 and 70 were further materially misleading because they created the misleading impression that the amount of goodwill that the Company would relinquish in connection with the anticipated sale

of the industrial portfolio was $20 million and that there would not be further reductions of goodwill in connection with the transaction

**B. Defendants' False And Misleading Statements To The Public On September 30, 2019**

73. On September 30, 2019, Colony Capital issued the September 2019 Press Release, announcing that it had entered into a definitive agreement with Blackstone under which Blackstone would acquire Colony Industrial, the industrial real estate assets and affiliated industrial operating platform of Colony Capital, for an aggregate purchase price of $5.9 billion. The September 2019 Press Release touted the benefits of the sale, stated in relevant part:

> Colony . . . and Blackstone Real Estate Partners IX, an affiliate of Blackstone (NYSE: BX), announced today that they have entered into definitive agreements for Blackstone to acquire Colony Industrial, the industrial real estate assets and affiliated industrial operating platform of Colony Capital, for an aggregate purchase price of $5.9 billion.
>
> The Colony Industrial last-mile light industrial portfolio represents the substantial majority of the total transaction and comprises approximately 60 million square feet of infill, logistics assets across 465 light industrial buildings in 26 U.S. markets, with significant concentration in Dallas, Atlanta, Florida, northern New Jersey, and California. The transaction also includes Colony's 51% ownership interest in a 4 million square foot portfolio of bulk distribution assets and the affiliated operating platform which manages the properties of both portfolios. The aggregate net sales proceeds to Colony are expected to be in excess of $1.2 billion.
>
> This transaction comprises one of the highest quality portfolios of last-mile logistics assets in the U.S. Colony Industrial was formed in December 2014 through Colony Capital's acquisition of Cobalt Capital Partners, founded and led by Lewis D. Friedland. Since then, the portfolio has doubled in size and produced strong and consistent operating results.
>
> * * *
>
> Each of the agreements is subject to customary closing conditions, including third party consent for the sale of the 51% interest in the bulk industrial portfolio, and is expected to close in the fourth quarter of 2019.

> Willkie Farr & Gallagher served as legal counsel, and Morgan Stanley and Eastdil Secured served as financial advisors, and CBRE National Partners served as real estate advisor to Colony Capital. Simpson Thacher & Bartlett served as legal counsel to Blackstone.

74. The September 2019 Press Release also quoted several high-ranking members of both Blackstone's and Colony Capital's management who touted the sale of Colony Industrial, stating, in relevant part:

> Darren Tangen, President of Colony Capital, stated, "We appreciate Blackstone has recognized the value that we've created at Colony Industrial and they are the ideal steward to lead this business during the next phase of its growth. Lew Friedland and the Colony Industrial team have executed flawlessly, achieving and even surpassing the goals of our original investment thesis five years ago. ***This sale allows Colony to both achieve compelling returns for our investors and generate significant liquidity, which among other uses, will help accelerate our ongoing transition into digital real estate and infrastructure***."
>
> Nadeem Meghji, Head of Real Estate Americas at Blackstone, stated, "This acquisition of high quality warehouses demonstrates our continued strong conviction in logistics and positive e-commerce trends. As retailers continue to shorten delivery times and expand their last mile footprints, we believe warehouses in dense population centers will continue to experience outsized demand growth."
>
> Lew Friedland, Managing Director, Head of Colony Industrial, commented, "Last-mile logistics real estate continues to become an increasingly critical component of the global supply chain. We are pleased to have generated strong returns for our investors implementing this strategy and the portfolio and platform are extremely well-positioned for the positive market environment and continued growing demand for last-mile logistics space."

75. The statements in ¶¶ 73-74 were materially false and/or misleading and/or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose the following adverse facts:

(1) Colony Capital's sale of its industrial real estate portfolio and the bifurcation of Colony Credit's portfolio were foreseeably likely to materially reduce Colony Capital's future investment management fee income and would require Colony Capital to impair goodwill by hundreds of millions of dollars;

(2) By touting the benefits of the sale of the industrial real estate portfolio without disclosing the expected impacts of the transaction on Colony's projected income and goodwill, Defendants created a distorted impression of the net impacts of the transaction on the Company's financial and operating results;

(3) Certain assets of Colony Capital's remaining portfolio companies carried unsustainable levels of debt secured by hotels and healthcare-related properties and were at a significant risk of default; and

(4) As a result of the foregoing, the Company's public statements misrepresented the Company's true financial condition, likely future cash flows and income, liquidity, and credit risks.

76. Additionally, the statements in ¶¶ 73-74 were materially misleading because (1) as of September 30, 2019, Colony Capital's third fiscal quarter had been completed, Colony Capital and Colony Credit had completed their strategic asset reviews, the terms of the sale of the industrial real portfolio were fixed, and the precise size of the goodwill impairment was more clearly known to Defendants, and (2) by speaking on the same subject of the prior misleading statements made on August 8, 2019, Defendants created a duty to correct the misleading impression created by those prior statements, which had only become increasingly misleading over time.

### C. Defendants' False And Misleading Statements To The Public On November 8, 2019

77. On November 8, 2019, Colony Capital hosted an earnings call with investors and analysts to discuss its financial and operating results for the third fiscal quarter ended September 30, 2019 ("Q3 2019"). While providing an overview of the financial and operating results of the third quarter of 2019, Defendant Barrack stated, in relevant part:

> Now looking ahead. Sale at industrial is anticipated to generate roughly $1.2 billion in net equity proceeds to Colony Capital, and we expect this transaction to close by year-end. ***As a result of the sale and other monetizations referenced earlier, Colony Capital will be equipped with a substantial quantum of liquidity at what we think will be a very appropriate time.***

78. In addition, while providing an overview of the Company's financial results for the quarter, Defendant Hedstrom stated, in relevant part:

> Starting with the health care real estate segment, same-store portfolio NOI decreased 7% compared to second quarter 2019. Third quarter 2019 same-store net operating income included a onetime write-off of certain tenant rent receivables in the hospitals portfolio. Excluding onetime items from same-store NOI, the Healthcare same-store portfolio sequential quarter-to-quarter comparable net operating income would have decreased only 4%. On the financing front, we refinanced a $212 million British pound loan on a portfolio of U.K. senior housing assets with a new GBP 223 million, fully extended 5-year loan at a substantially reduced interest rate. ***This refinancing, along with previously completed refinancing transactions this year, addresses all near-term health care real estate loan maturities***.
>
> ***
>
> Subsequent to the June 2019 refinancing of the largest health care loan, the company unwound the entire swap in the aggregate amount of $365 million. For core FFO purposes, the company has excluded realized losses related to the swap because the swap was an economic hedge against the refinancing risk of the maturing debt in the Healthcare

> portfolio, and core FFO does not reflect any realized gains or losses within our real estate verticals or investment management businesses.

79. The statements in ¶¶ 77-78 were materially false and/or misleading and/or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose the following adverse facts:

(1) Certain assets of Colony Capital's remaining portfolio companies carried unsustainable levels of debt secured by hotels and healthcare-related properties and were at a significant risk of default; and

(2) As a result of the foregoing, the Company's public statements misrepresented the Company's true financial condition, likely future cash flows and income, liquidity, and credit risks.

**D. Defendants' False And Misleading Statements To The Public On February 28, 2020**

80. On February 28, 2020, Colony Capital issued its Q4 2019 Press Release. With respect to hospitality and healthcare, the Q4 2019 Press Release touted as a financial highlight, in relevant part: "[r]efinanced a £212 million loan on a U.K. portfolio of senior housing assets and a $48 million loan on skilled nursing facilities portfolios, which, together with previously completed refinancing transactions in 2019, ***addresses all material near-term healthcare real estate loan maturities***."

81. In addition, the Q4 2019 Press Release stated: "***[w]ith respect to the healthcare and hospitality units, the Company successfully addressed all material near-term debt maturities*** allowing the respective business unit leaders to focus on improving cash flows through operational management and capital expenditures."

82. That same day, Colony Capital hosted an earnings call with investors and analysts. While providing an update of the Company's financial and operating performance of the fourth quarter of 2019, Defendant Barrack stated, in relevant part:

> Healthcare, we refinanced an aggregate $2.2 billion of debt, including $1.725 billion [in AGAR] loan refinancing. ***That address[ed] all of our material near-term maturities and puts us in a very good shape***.
>
> In addition, we've sold three hospitals, generating $88 million of equity proceeds.

83. In addition, while providing an overview of the Company's financial results for the quarter, Defendant Hedstrom stated, in relevant part:

> Moving to the healthcare real estate segment. The fourth quarter included a onetime recovery of rent receivables and termination fees, which resulted in an 11% same-store portfolio NOI increase from the third quarter. Excluding these onetime items, same-store NOI was flat. Same-store portfolio full year 2019 NOI was also flat compared to 2018. There were two significant transactions on the healthcare financing front. We refinanced the GBP 212 million loan on a portfolio of UK senior housing assets with a new GBP 223 million fully extended five-year loan at a substantially reduced interest rate. Additionally, we put in place a $48 million loan on a skilled nursing facility, lengthening the fully extended maturity date to 2024 at a similar interest rate. ***These refinancings, along with previously completed refinancing transactions in 2019, address all near-term healthcare real estate loan maturities, which was a key 2019 objective***.

84. Finally, when asked about special dividends, Defendant Barrack stated, in relevant part:

> The legacy businesses are stabilized, they're doing actually better than we anticipated in a different way. So, one time when we talk about special dividend, we've got hospitality and healthcare, ***we trimmed out debt to stabilize the income stream, other than the last week, and with ramifications of coronavirus and the volatility in this market are, we're comfortable keeping that cash flow going as we transition. And depending on what happens with CLNC, we always have that as an added liquidity device*** to by either special dividend to convert into cash to do the other things that we've always said that we'll analyze, buying back stock, trim the down the balance sheet, utilize for greater digital acquisitions. But ***we've got plenty of liquidity***.

85. The statements in ¶¶ 80-84 were materially false and/or misleading and/or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose the following adverse facts:

(1) Certain assets of Colony Capital's remaining portfolio companies carried unsustainable levels of debt secured by hotels and healthcare-related properties and were at a significant risk of default;

(2) As a result of the foregoing, the Company's public statements misrepresented the Company's true financial condition, likely future cash flows and income, liquidity, and credit risks.

**E. Defendants' False And Misleading Statements To The Public On March 2, 2020**

86. On March 2, 2020, Colony Capital filed its 2019 10-K. The 2019 10-K was signed by Defendants Barrack and Hedstrom. The 2019 10-K contained the following representations with respect to the condition of its portfolio of companies in the healthcare and hospitality segments:

> ***With respect to the healthcare and hospitality segments, the Company successfully addressed all material near-term debt maturities, allowing the respective business unit leaders to focus on improving cash flows through operational management and capital expenditures.*** The Company does not currently anticipate significantly shortened hold periods for its healthcare and hospitality assets solely as a result of its current strategy to focus on digital real estate and infrastructure. Holding periods will depend, in part, on prevailing economic conditions and market opportunities as they arise. ***In the fourth quarter of 2019, the Company continued to perform its impairment assessment of healthcare and hospitality assets in accordance with its policies and in the normal course of business, and applied its best estimate at this time based upon undiscounted future net cash flows to be generated by these assets over a long-term hold.***

87. The statements in ¶ 86 were materially false and/or misleading and/or omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose the following adverse facts:

(1) Certain assets of Colony Capital's remaining portfolio companies carried unsustainable levels of debt secured by hotels and healthcare-related properties and were at a significant risk of default;

(2) As a result of the foregoing, the Company's public statements misrepresented the Company's true financial condition, likely future cash flows and income, liquidity, and credit risks.

## VI. LOSS CAUSATION

88. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

89. During the Class Period, as a result of the open, well-developed, and efficient market for Colony Capital's stock, the prices of Colony Capital's stock fell when the misrepresentations alleged herein, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed to investors and the artificial inflation was removed over time from the price of Colony Capital's stock. Defendants' wrongful conduct, alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Colony Capital's stock price throughout the Class Period until Defendants began to disclose the truth regarding the Company's financial condition to the market.

90. The truth regarding Colony Capital's financial condition was revealed, and/or Defendants' materially false and misleading statements were partially corrected, and/or the concealed risks partially materialized, on November 7-8, 2019 and May 8, 2020.

91. On November 7, 2019, after market close, Colony Credit issued a press release announcing its financial and operating results for the third fiscal quarter ended September 30, 2019 (the "Colony Credit Press Release"). In the Colony Credit Press Release, Colony credit announced that it had bifurcated its assets into a

core portfolio and a legacy, non-strategic portfolio. In relevant part, the press release stated:

> Kevin P. Traenkle, President and Chief Executive Officer of Colony Credit Real Estate, commented, "For several reasons, the third quarter has been a landmark period for the Company. First, our Core Portfolio and primary business of providing high-quality commercial real estate loans continues to grow and perform well, as evidenced by over $480 million of new quarterly originations. Additionally, we successfully closed an accretive $1 billion CLO financing in October, opening new sources of capital, de-risking our balance sheet and increasing our return on equity."
>
> Mr. Traenkle added, "***However, and more importantly, we made great strides in advancing our strategic plan to bifurcate our Company's assets into our Core Portfolio, which we plan to grow, and a Legacy, Non-Strategic Portfolio, which we plan to monetize and reinvest into our Core Portfolio. As part of this undertaking and with the full support of our Board, third party valuation experts assisted the Company in a robust strategic reassessment of our entire asset base. During this process we identified and separated a Legacy, Non-Strategic Portfolio and made meaningful changes to the original business plans. Going forward, we plan to report the operations and dispositions from our Core Portfolio and the Legacy, Non-Strategic Portfolio separately***."
>
> Mr. Traenkle continued to add, "***Due to the changes we have made to the business plans of investments within our Legacy, Non-Strategic Portfolio, the Company meaningfully reduced its book value to better reflect the market value of such assets*** and also reset its dividend to a level which is now fully covered by in-place Core Earnings from the Core Portfolio alone. We expect most of the Legacy, Non-Strategic Portfolio to be monetized in the short to medium term and the proceeds of such sales will provide capital to grow our Core Earnings within our Core Portfolio. I strongly encourage all to review our portfolio bifurcation presentation and quarterly financial and supplemental materials, with substantially enhanced details and disclosures. Based on the results of this analysis, we believe the Company's current net asset value and book value are significantly higher than current trading value."

92. In addition, the Colony Credit Press Release disclosed that, in connection with the bifurcation plan, Colony Credit and CLNC Manager had amended and restated the management agreement to reduce the base management fee by $13 million per year. Specifically, the press release stated:

> Subsequent to quarter end, the Company's manager, a subsidiary of Colony Capital, Inc. and the Company ***revised the terms of the management agreement in connection with CLNC's portfolio bifurcation plan and related impairments, which will result in a reduction to the fee base*** by accumulated unrealized provisions for loan losses and real estate impairments to date. ***Such reduction will be effective during the fourth quarter 2019 and result in a $13 million decrease of the annual base management fee paid by the Company*** . . . .

93. The next morning, on November 8, 2019, during pre-market hours, Colony Capital issued its Q3 2019 Press Release. Among other results, the Company reported a GAAP net loss of $555 million, or $1.16 per share, which "notably included reductions of goodwill, impairments of real estate and provision for loan losses totaling $540.3 million . . . of which $387.0 million was attributable to the reduction of goodwill primarily as a result of the pending sale of the Company's industrial investment management business and related real estate portfolio, and the decrease in management fees from Colony Credit Real Estate, Inc. . . . resulting from impairments related to its portfolio bifurcation . . . ."

94. On this news, Colony Capital's stock price fell $0.48 per share, or 8.76%, to close at $5.00 per share on November 8, 2019.

95. On May 8, 2020, Colony Capital issued its Q1 2020 Press Release. The Q1 2020 Press Release stated, in relevant part:

> The Company's hospitality portfolio and the THL [hotel] portfolio have total debt outstanding as of March 31, 2020 is [sic] $3.5 billion ($3.0 billion CLNY OP share). ***$3.2 billion of consolidated debt ($2.6 billion CLNY OP share) is currently in default and, in May 2020, the Company received a notice of acceleration with respect to $780 million of defaulted consolidated debt*** ($702 million CLNY OP share).

> The remaining debt is not in default as of the date of this report. The Company is in active negotiations with all lenders to execute forbearances and/or debt modifications, including extension of upcoming maturities in 2020, or seek other accommodations. There can be no assurances that the Company will be successful in such negotiations.

96. On this news, Colony Capital's stock price fell $0.08 per share, or 3.81%, to close at $2.02 per share on May 8, 2020.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

97. As alleged herein, Defendants acted with scienter since Defendants knew or were deliberately reckless in disregarding that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew or were deliberately reckless in disregarding that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Colony Capital, their control over, and/or receipt and/or modification of Colony Capital's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Colony Capital, participated in the fraudulent scheme alleged herein.

98. The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated. The Individual Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiff and the Class.

**A. Colony Capital's Historic Goodwill Impairment Practices Highlight The Intentional And/Or Deliberately Reckless Nature Of Defendants' Failure To Disclose The Anticipated Goodwill Impairments In Q2 2019**

99. Colony Capital conducts an impairment test for goodwill on an annual basis, but it conducts a test more frequently if events or changes in circumstances occur that more likely than not reduce the fair value of a reporting unit below its carrying value. As the Company explained in its Form 10-Q filed with the SEC on November 9, 2017 for the third fiscal quarter ended September 30, 2017 (the "Q2 2017 10-Q"), under its Summary of Significant Accounting Policies:

> Goodwill is an unidentifiable intangible asset and is recognized as a residual, generally measured as the excess of consideration transferred in a business combination over the identifiable assets acquired, liabilities assumed and noncontrolling interests in the acquiree. Goodwill is assigned to reporting units that are expected to benefit from the synergies of the business combination.
>
> ***Goodwill is tested for impairment at the reporting units to which it is assigned at least on an annual basis in the fourth quarter of each year, or more frequently if events or changes in circumstances occur that would more likely than not reduce the fair value of a reporting unit below its carrying value***. The assessment of goodwill for impairment may initially be performed based on qualitative factors to determine if it is more likely than not that the fair value of the reporting unit to which the goodwill is assigned is less than its carrying value. If so, a two-step quantitative assessment is performed to determine if an impairment has occurred and measure the impairment loss. In the first step, if the fair value of the reporting unit is less than its carrying value (including goodwill), then the goodwill is considered to be impaired. In the second step, the implied fair value of the goodwill is determined by comparing the fair value of the reporting unit (in step one) to the fair value of the net assets of the reporting unit as if the reporting unit is being acquired in a business combination. If the carrying value of goodwill exceeds the resulting implied fair value of goodwill, then an impairment charge is recognized for the excess. An impairment establishes a new basis for the goodwill and any impairment loss recognized is not subject to subsequent reversal. Goodwill impairment

> tests require judgment, including identification of reporting units, assignment of assets and liabilities to reporting units, assignment of goodwill to reporting units, and determination of the fair value of each reporting unit.

100. As described in detail *supra*, in Q2 2019, Defendants conducted a strategic asset review, engaged advisers market the Company's portfolio of industrial assets, and modified the presentation of Colony Capital's financial statements to show the assets and liabilities of the Industrial segment as held for sale and to show all revenues, costs and expenses of the Industrial segment under the category of discontinued operations. The Company, however, did not record any impairment of goodwill. As explained in the Q2 2019 10-Q:

> Goodwill balance of $1.5 billion at June 30, 2019 and December 31, 2018 resides in the investment management segment. Goodwill assigned to the industrial segment of $20.0 million is classified as held for sale (Note 7).
>
> Goodwill is assessed for impairment at the Company's operating segments or one level below. The Company performs its annual impairment test in the fourth quarter of each year. Based upon the Company's most recent annual impairment test in 2018, the Company determined that its investment management goodwill was not impaired. Additionally, ***no impairment was recognized on the investment management goodwill during the six months ended June 30, 2019***.

101. Thus, even though Defendants had decided to treat the assets and liabilities of the Industrial segment as "held for sale" and to report its operating results under "discontinued operations," and even though Defendants knew that the disposition of the Industrial segment would materially decrease future investment management fee income, Defendants elected not to record any impairment to goodwill on the investment management segment.

102. In Q3 2017, however, Colony Capital recorded an impairment of goodwill relating to the disposition of a business unit, even though the transaction had not been completed and the unit was "held for sale." In the Q3 2017 10-Q,

under Note 8 to the Consolidated Financial Statements, entitled "Goodwill, Deferred Leasing Costs and Other Intangibles," the Company stated, in relevant part:

> Goodwill associated with each of the Company's business combinations is attributed to the following reportable segments. Goodwill of $1.4 billion in the investment management segment arose from the Merger (Note 3), ***of which $0.2 billion is excluded below as it relates to the Townsend investment management business that is held for sale at September 30, 2017*** (Note 9).
>
> ***
>
> No impairment was recognized on goodwill in connection with the industrial and investment management segments above during the nine months ended September 30, 2017 and 2016. ***However, impairment was recorded on the Townsend goodwill in the three months ended September 30, 2017, as discussed in Note 9***.

103. In addition, in the Q3 2017 10-Q, under Note 9 to the Consolidated Financial Statements, entitled "Assets and Related Liabilities Held for Sale," the Company reported $240.7 million of goodwill associated with the Townsend business unit held for sale. It included an explanatory footnote that stated:

> ***Associated with Townsend investment management business. Impairment of $9.1 million was recorded in the three months ended September 30, 2017 based on the net asset value of the Townsend business in relation to its contracted selling price***. As of September 30, 2017, $147.2 million of the Townsend goodwill is deductible for income tax purposes.

104. Furthermore, under Item 2 of the Q3 2017 10-Q, *i.e.*, the Management's Discussion and Analysis of Financial Condition and Results of Operations, the Company included a discussion of Impairment Loss in which the Company stated, in relevant part:

> Investment Management—The $9.1 million impairment represents a write-down of goodwill allocated to the Townsend operating segment based on the net asset value of the Townsend business compared to its contracted sale price. The sale is expected to close in the fourth quarter of 2017 or the first quarter of 2018.

105. As the Company later clarified in a subsequent SEC filing,[4] the impairment recorded in Q3 2017 in relation to the sale of Townsend was merely a "***preliminary write-down***" of goodwill associated with a business unit that was "held for sale." In its Q3 2018 10-Q, the Company stated:

> Goodwill is assessed for impairment at the Company's operating segments or one level below. The Company performs its annual impairment test in the fourth quarter of each year. As a result of the Company's annual impairment test in 2017, the Company recognized an impairment to the investment management goodwill of $316.0 million.
>
> No impairment was recognized on the goodwill balance above during the nine months ended September 30, 2018 and 2017. ***However, <u>in the third quarter of 2017, there was a $9.1 million preliminary write-down of the goodwill associated with the Townsend business that was held for sale</u>, with the impairment fully reversed upon finalization of the net asset value and sales price of the Townsend business upon closing of its sale in December 2017***.

106. Thus, through the Company's previous goodwill impairment practices and disclosures, the Defendants indicated to the market that (1) even though the Company conducted its annual impairment test during the fourth quarter, the Company also reviewed goodwill throughout the fiscal year and would record impairments to goodwill if events or changes in circumstances suggested that the fair value of a reporting unit was lower than its carrying value, (2) the Company would record goodwill impairments related to the disposition of business units that were "held for sale," even if those dispositions were not final, and (3) the Company would record "preliminary write-downs" to provide investors with meaningful information in real time, even if it understood that the circumstances giving rise to the impairment were not set or subject to change.

---

[4] On November 9, 2019, the Company filed with the SEC its Form 10-Q for the third fiscal quarter ended September 30, 2018 (the "Q3 2018 10-Q").

107. Defendants' failure to disclose the anticipated goodwill impairments in relation to the sale of the Industrial portfolio and the bifurcation of the Colony Credit portfolio at the time that Colony Capital released its Q2 2019 financial results was a deviation from these practices. That Defendants chose not to disclose this clearly material information, in contravention of prior practices, is strongly suggestive of either an intention to deceive or, at a minimum, a deliberately reckless disregard of the risk of misleading investors.

108. Even if Colony Capital were not formally required to record an impairment of goodwill in its Q2 2019 financial statements by Generally Accepted Accounting Principles ("GAAP") or the Company's accounting policies, Defendants nevertheless owed a duty to disclose known likely future impairments in order to render their other affirmative statements during the Class Period, identified *supra*, not misleading. This is especially true in light of the analyst inquiry about impairments expected in future quarters. *See* ¶ 67, *supra*.

## VIII. <u>CLASS ACTION ALLEGATIONS</u>

109. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Colony Capital securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

110. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Colony securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed

Class. Record owners and other members of the Class may be identified from records maintained by Colony Capital or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

111. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

112. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

113. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Colony Capital;
- whether the Individual Defendants caused Colony Capital to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Colony Capital securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

114. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

115. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Colony Capital securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Colony Capital securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

116. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

117. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

118. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

119. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as “forward-looking statements” when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

120. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the

forward-looking statement was authorized or approved by an executive officer of PPG who knew that the statement was false when made.

## X. COUNTS

### COUNT I
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

121. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

122. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

123. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or deliberately recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Colony Capital securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Colony Capital securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

124. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or

issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Colony Capital securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Colony Capital's finances and business prospects.

125. By virtue of their positions at Colony Capital, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

126. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Colony Capital, the Individual Defendants had knowledge of the details of Colony Capital's internal affairs.

127. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Colony Capital. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Colony Capital's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and

public statements, the market price of Colony Capital securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Colony Capital's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Colony Capital securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

128. During the Class Period, Colony Capital securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Colony Capital securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Colony Capital securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Colony Capital securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

129. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

130. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during

the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II
## (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

131. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

132. During the Class Period, the Individual Defendants participated in the operation and management of Colony Capital, and conducted and participated, directly and indirectly, in the conduct of Colony Capital's business affairs. Because of their senior positions, they knew the adverse non-public information about Colony's misstatement of income and expenses and false financial statements.

133. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Colony Capital's financial condition and results of operations, and to correct promptly any public statements issued by Colony Capital which had become materially false or misleading.

134. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Colony Capital disseminated in the marketplace during the Class Period concerning Colony Capital's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Colony Capital to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Colony Capital within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Colony Capital securities.

135. Each of the Individual Defendants, therefore, acted as a controlling person of Colony Capital. By reason of their senior management positions and/or being directors of Colony Capital, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Colony Capital to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Colony Capital and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complaint.

136. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Colony Capital.

## XI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demands judgment against Defendants as follows:

A. declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

D. awarding equitable, injunctive, and other relief as the Court may deem just and proper.

## XII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: September 14, 2020

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Robert V. Prongay*
Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com

**FINKELSTEIN & KRINSK LLP**
Jeffrey R. Krinsk (SBN 109234)
501 West Broadway, Suite 1260
San Diego, California 92101
Telephone: (619) 238-1333
Email: jrk@classactionlaw.com

*Counsel for Lead Plaintiffs James Alpha Global Real Estate Investments Portfolio and James Alpha Multi Strategy Alternative Income Portfolio and Proposed Lead Counsel for the Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On September 14, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 14, 2020, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay